UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RACHELLE R. GREEN
and BRYAN R. RENFRO,
    Plaintiffs,

    v.                           C.A. No. 02-534L

EXXONMOBIL CORPORATION,
JANET L. MADIGAN, in her official
Capacity as Plan Administrator for
ExxonMobil Corporation, and
EXXONMOBIL LIFE INSURANCE PLAN,
    Defendants.

DECISION AND ORDER

Ronald R. Lagueux, Senior District Judge.

This case arises from the tragic and untimely death of
Plaintiffs' father, Dr. Robert H. Renfro, on February 26, 2001,
from injuries sustained in a car accident the previous day.  At
the time of his death, Dr. Renfro was employed by Defendant
ExxonMobil Corporation (hereinafter "ExxonMobil").  After Dr.
Renfro's death, Defendants failed to pay the benefits to which
Plaintiffs believed they were entitled as his beneficiaries, and
this dispute ensued.  Plaintiffs Rachelle Green and Byron Renfro
are Dr. Renfro's two adult children and his sole beneficiaries.
They filed a complaint pursuant to the Employee Retirement Income
Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, seeking
recovery of the benefits.  The operative complaint is a three-
count Second Amended Complaint naming as defendants Dr. Renfro's
employer ExxonMobil, the ExxonMobil Life Insurance Plan, an
employee welfare benefit plan, and Janet L. Madigan, the

Administrator of the Plan.  Count I of the complaint, brought

pursuant to ERISA section 1132(a)(1)(B), alleges that Defendants

denied Plaintiffs the benefits to which they were entitled, and

seeks judgment in the amount of those benefits.  Counts II and

III seek equitable relief pursuant to ERISA section 1132(a)(3)

for two different breaches of fiduciary duty allegedly owed to

Plaintiffs by Defendants.

The case was litigated during a five-day bench trial before

this Court in April 2005 and the parties submitted post-trial

briefs.  After a review of the trial testimony, the exhibits and

the parties' post-trial submissions, this Court now renders a

decision in this case for the Defendants on all counts.

## FINDINGS OF FACT

Dr. Renfro began work for the Mobil Oil Corporation as a

contract physician in April 1996, at an oil refinery in Beaumont,

Texas.  In November 2000, he applied for permanent employment

with the post-merger ExxonMobil Corporation as a staff physician

in the same location.  According to Plaintiffs' testimony at

trial, their father had looked into several employment options

and chose the ExxonMobil position because of the benefits offered

by the company.  Dr. Renfro's new position was confirmed by

ExxonMobil on January 15, 2001, with a letter that included forms

that needed to be completed before his first day of work.

Dr. Renfro was required to fill out more employment-related

-2-

forms on his first day of work, February 19, 2001.  These
completed forms were reviewed by Dr. Renfro's unit in Beaumont
and then mailed to ExxonMobil employee Elizabeth Hagler in the
Benefits Administration office in Houston, where the paperwork
for new employees was processed.  Hagler reviewed and verified
the forms, and then entered Dr. Renfro into the company's
computer system on February 22.  This triggered the generation of
a packet of benefit forms on February 23 by Euretia Williams,
another Benefits Administration employee.  The benefits packet
was returned to Hagler, who reviewed it, signed it and placed it
in the office's outgoing mailbox on Monday morning, February 26,
2001, to be mailed to Dr. Renfro.

### The benefits packet

The benefits packet included documents describing
ExxonMobil's employee benefits, as well as various enrollment
forms.  Of central interest to the present dispute is the
ExxonMobil Life Insurance Plan which was made up of four
components:  Basic Life; Basic Accidental Death and
Dismemberment; Group Universal Life; and Voluntary Death and
Dismemberment.

The Basic Life Insurance plan was designed to go into effect
automatically on the first day of Dr. Renfro's regular
employment, with premiums paid by ExxonMobil.  Under its terms,
Dr. Renfro's beneficiaries would receive 200% of his annual

-3-

salary after his death.

The Basic Accidental Death and Dismemberment plan was also paid for by the company and was effective at the commencement of Dr. Renfro's employment.  This coverage provided a payment of 200% of his annual pay to his beneficiaries at his death.

In addition, Dr. Renfro had the option to participate in the Group Universal Life insurance program (hereinafter "GUL")for which he was eligible on his first day of regular employment. GUL provided life insurance benefits at a level of up to five times the employee's annual rate of pay, with premiums to be paid by the employee based on the selected benefit level.  In order to participate, it was necessary for the employee to make an election and complete an election form.  Participation was effective the day the completed form was received by the Plan Administrator.  The terms of the GUL plan specified that payment of the benefit would only be made if the participant died while the coverage was in effect.

Voluntary Accidental Death and Dismemberment insurance (hereinafter "VADD") was offered to regular employees to pay out at the rate of one to eight times their annual salary, with premiums to be paid by the employee.  As with the GUL coverage, an employee was eligible to participate on the first day of work, and an election form was required to commence participation.  The VADD plan stipulated that accidental death benefits would be paid

-4-

only if the coverage was in effect at the time of the accident. As Dr. Renfro's beneficiaries, Plaintiffs have received the Basic Life and the Basic Accidental Death benefits (totaling $628,000), but no benefit payments from the GUL or VADD plans. It is these payments to which Plaintiffs believe they are now entitled.

ExxonMobil also offered medical insurance to its employees through the ExxonMobil Medical Plan. The completion of forms, along with some choices among optional coverages, were required for enrollment in this Plan; however, coverage was effective as of the employee's first day of work. As explained further below, arrangements were made so that Dr. Renfro would receive this medical insurance coverage while he was hospitalized.

### The elections made on Dr. Renfro's behalf

On Monday morning, February 26, 2001, shortly after Elizabeth Hagler placed Dr. Renfro's packet of benefit forms in the outgoing mailbox, a phone call came into the office with the news that he had been in car accident Sunday night. The staff learned that Dr. Renfro was hospitalized and on life-support.

Mary Elizabeth McComas, a Benefits Administration employee, contacted Elda Smith, U.S. Benefits Manager, to coordinate making an emergency election of medical coverage for Dr. Renfro. McComas called Hagler, who retrieved Dr. Renfro's benefits packet from the outgoing mailbox. Hagler made a selection of the Preferred Provider Organization medical care coverage on Dr.

-5-

Renfro's behalf, and informed the insurance carrier of the coverage by fax.  Dr. Renfro died later that day.

The following day, Kathy McCoy, Retirement Services Supervisor, e-mailed Benefits Administration legal counsel in Dallas, Sherry Englande, saying, "This is a new employee who died as a result of a car accident prior to making various benefit elections.  My thoughts were we would assume he would have elected maximum coverage under Group Universal Life and Voluntary AD&D.  Do you agree?"  Englande responded, "I do not have any objections to assuming that this employee would have elected the maximum amount of GUL and VADD. Although none of us have a crystal ball to see into our future, it is certainly possible that this person wanted to elect the maximum amount of coverage available.  His family shouldn't be denied that coverage just because Mr. Renfro was killed before he had an opportunity to document his wishes with a formal election."  McCoy then instructed Hagler to enter the elections into the computer system.  Hagler sent McCoy an e-mail on the afternoon of the 27th, explaining, "I just input his GUL and VADD with a coverage begin date of 2-23-01."

### The letters to Plaintiffs

On April 11, 2001, Benefits Counselor Debbie McGuire in Houston sent a letter to Plaintiffs, Dr. Renfro's beneficiaries. The letter included several enclosures, one of which was labeled

-6-

"Estimate of Survivor Benefits."  This document listed Dr.
Renfro's annual and monthly salary, and indicated that Plaintiffs
would share equally in "One-Time Lump Sum Life Insurance
Payments," which would include Basic Life Insurance of $314,000,
Accidental Death and Dismemberment of $314,000, GUL benefits of
$785,000, and VADD benefits of $1,256,000.  The total was
followed by a disclaimer that read: "In the event of any
inconsistency between the information contained in this statement
and the provisions of the plans, the plans, as well as any
applicable administrative regulations, will govern."

Soon after, Benefits Administration personnel forwarded the
claim to Metropolitan Life Insurance Company (hereinafter
"MetLife"), the underwriter for the GUL and VADD portions of the
Plan.  Word was quickly received back from MetLife that it would
not pay the GUL and VADD claims because Dr. Renfro had not
executed the optional life insurance election forms.  Both McCoy
and Englande testified at trial that, when they heard of
MetLife's response, they realized they had made a significant
error.  ExxonMobil legal counsel Sherry Englande testified that
she "went back to the Plan document to confirm for myself what
MetLife was saying, and as soon as I looked at the Plan document,
I realized that I had made a terrible mistake." Trial transcript,
vol. III, p. 68.

Another round of e-mailed messages, meetings, phone calls

-7-

and phone conferences ensued as ExxonMobil employees tried to figure out what to do next.  At this point for the first time, Plan Administrator Janet Madigan was brought into the deliberations.  Attorney David Blake, legal counsel in the Compensation and Benefits division of ExxonMobil's Tax Department, testified that he provided Madigan with advice at this phase of the events.  Blake testified that his advice was,

> ...that the individuals that had sent the benefit statement originally did not have authority to determine the level of coverage that Dr. Renfro had or whether or not he would be extended VADD or GUL coverage. ... my advice to Ms. Madigan was that she had discretion to extend or not extend that coverage, and she was the only one, aside from Rod Lease [designated by the Plan as the Assistant Administrator Benefits], who had that authority.  And so any letter or communication that had been made in the past was not made by somebody who had authority and she needed to make that determination.

Trial transcript, Vol. III, p. 89.  Both Madigan and Blake also testified that the decision to provide Dr. Renfro with medical insurance coverage during his final hours of life was undertaken by McComas and Smith without proper authority, and could only properly have been made by Madigan.  However, Madigan retroactively approved that decision.

In early May, Madigan, Blake and Englande in Dallas, communicated via conference call with McCoy, Benefits Design Manager Don Boucher and Benefits Specialist Joan Gerosa in

-8-

Houston.   During that call, Madigan conveyed her decision not to extend GUL and VADD coverage to Dr. Renfro because he had died prior to making the necessary election.   A decision was reached that the Houston staff would draft a letter to the beneficiaries, which would be sent to Dallas for editorial feedback.

The final product was mailed to Plaintiffs on May 10, 2001. An excellent example of 'corporate-speak,' the letter apologized for "any inconvenience" caused by the first letter: "Unfortunately, because of a miscommunication concerning your father's benefits, the Statement of Survivor Benefits that was sent to you erroneously assumed that your father was covered under the Group Universal Life and Voluntary Accidental Death and Dismemberment Insurance coverages, when in fact he was not."   The letter explained further that coverage under the optional plans was not available because "your father had not elected to participate before his accident."

Plaintiffs clearly felt that they had been given something that was then taken away.   Unsatisfied by the responses to their informal inquiries, they hired legal counsel and filed an appeal in May 2002.

Madigan denied the appeal by letter on August 14, 2002. Citing the pertinent sections of the ExxonMobil Life Insurance Plan, Madigan explained that Dr. Renfro had no coverage under the GUL and VADD sections of the Plan because he died before an

election was made.  She further stated that the disclaimer
included on the benefits estimate in the initial letter was
"intended to cover situations such as this, where upon review, it
is determined that the benefit estimate is wrong."  In addition,
Madigan addressed the issue of whether election forms were
provided to Dr. Renfro in a timely manner.  "Pursuant to our
normal practices, enrollment and election forms are generally
provided to new employees within a few days of receiving employee
information and employment notification from the employing unit.
Forms are pre-printed with the employee's name and other
identifying information before being sent for employee's
completion and signature."  This, she wrote, was the same
procedure followed in Dr. Renfro's case.

 Eventually, Plaintiffs filed a complaint in this Court which
led ultimately to the bench trial in 2005.

### Standard of review

 The Supreme Court has held that when an ERISA fiduciary
exercises discretionary powers in the administration of the plan,
then the fiduciary's denial-of-benefits determination will be
reversed only if it is found by the Court to be arbitrary and
capricious.  <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S.
101, 111 (1989).  Subsequently, the Supreme Court extended the
'arbitrary and capricious' standard of review to claims of breach
of fiduciary duty.  <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 514

(1996).

This standard is described by the Supreme Court as a deferential standard, intended to prevent or rectify an abuse of discretion by the fiduciary.  <u>Id</u>. at 514 - 515.  Judge William Smith of this Court recently wrote,

> Even if the court disagrees with the decision, or if the employee offers a competing reasonable interpretation, the court must not disturb a plan administrator's interpretation if it is reasonable.  The arbitrary and capricious standard is the "least demanding form of judicial review" and requires only that determinations be "rational in light of the plan's provision," as well as reasonable with no abuse of discretion.

<u>Massey v. Stanley-Bostitch, Inc.</u>, 255 F. Supp. 2d 7, 11 (D.R.I. 2003) (quoting <u>Coleman v. Metropolitan Life Ins. Co.</u>, 919 F. Supp. 573, 581 (D.R.I. 1996)).

In the present case, an examination of the Common Provisions of ExxonMobil's Benefit Plans reveals the extent of Plan Administrator Janet Madigan's discretionary authority.  The Provisions state in Section 2.2 (B)(2), "The <u>Administrator-Benefits</u> (and those to whom the <u>Administrator-Benefits</u> has delegated authority) shall be vested with full and final discretionary authority to determine eligibility for benefits, to construe and interpret the terms of the <u>core benefit plans</u> in their application to any participant or beneficiary, and to decide any and all appeals relating to claims by participants or

-11-

beneficiaries."

Because Madigan is vested with full discretionary authority
to administer the Plan, to extend benefits, and to decide
appeals, Plaintiffs' claims, both for wrongful denial of benefits
and breach of fiduciary duty, will be reviewed by this Court
using the 'arbitrary and capricious' standard.

### Conclusions of law

### Count I

Count I of Plaintiffs' Second Amended Complaint seeks
benefits due pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B),
specifically $785,000 allegedly due them under the GUL plan and
$1,256,000 due under the VADD plan.  As the basis for their
claims, Plaintiffs assert that the decision to award these
benefits, based on the election made by the Benefits
Administration office employees immediately after Dr. Renfro's
death and memorialized by the letter to Plaintiffs of April 11,
2001, was an irrevocable decision, binding on all Defendants.
Despite Plaintiffs' numerous and varied arguments in support of
their theory, the Court is not convinced that the action of the
Benefits Administration employees in making a posthumous election
on behalf of Dr. Renfro was anything other than a mistake.
Certainly, no evidence indicates that Kathy McCoy or Sherry
Englande had the discretionary authority to bind the Plan or the
corporation to an extension of benefits that was contrary to the

clear terms of the Plan.

## No discretionary authority

The Common Provisions of the ExxonMobil Life Insurance Plan clearly state that the Plan Administrator, Janet Madigan, has full and final discretionary authority to determine eligibility for benefits.  While the Plan Administrator has the power to designate, in writing, someone to undertake these duties on her behalf, no such designation was made in this case.  In addition, the named fiduciary has the power, under Section 2.3(C) of the Common Provisions, to "employ one or more persons to render service with respect to any responsibility of such fiduciary."

The ERISA statute at 29 U.S.C. § 1002 (21)(A) provides that "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee [....,] or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

The application of this statutory definition to the employees in the Benefits Administration office leads to a tautology.  In deciding to extend the maximum GUL and VADD benefits to Dr. Renfro, those employees did, or at least attempted to, exercise control respecting the management of the

-13-

Plan and the disposition of its assets.  The question is did they have the authority to do so, or was their action outside the scope of their authority?

In <u>Watson v. Deaconess Waltham Hosp.</u>, 141 F. Supp. 2d 145 (D. Mass. 2001), the Court made a determination as to whether the defendant hospital was a fiduciary in light of actions undertaken by its human resources department.  Holding that the hospital was not a fiduciary, the Court wrote,

> The established law of the First Circuit is that the mere exercise of physical control over a plan or the performance of ministerial administrative tasks is insufficient to create fiduciary status.  The facts presented by Watson suggest nothing more than that Deaconess's Human Resources Department is responsible for routine matters related to the Liberty Plan:  it informs employees of their benefits, enrolls them in the Plan, and acts as intermediary between the employee and the insurer.

141 F. Supp. 2d at 153 (cites omitted).

This Court concludes that the 'ministerial administrative' role is the one that best describes the actual duties of the ExxonMobil Benefits Administration office in Houston.  These employees were the staff members employed to "render service with respect to any responsibility of such fiduciary" as provided for in the Plan's Common Provisions.  Janet Madigan's quick action to correct the mistake made by these employees, their testimony that they realized they had made a mistake, the testimony concerning

-14-

the employees' job descriptions, and the terms of the Common
Provisions, all point to the conclusion that the Houston Benefits
Administration office staff was not routinely involved in
benefits determinations at the level of the one made on behalf of
Dr. Renfro.  With Dr. Renfro's sudden and unexpected death so
soon after the commencement of his employment, the employees
faced a circumstance that was unique and emotionally compelling.
Their response was human, albeit rash.

In any case, even if the Benefits Administration employees
had some discretionary authority – did they have the authority to
make a decision such as this one?  The terms of the Common
Provisions grant Madigan "full and final discretionary authority
to determine eligibility for benefits."  Clearly, under the terms
of the Plan, Madigan was the ultimate authority, regardless of
what duties had been delegated, vel non, to the Benefits
Administration office.  Consequently, even if the extension of
benefits decision by McCoy and Englande were within the scope of
their authority, it was not irrevocable because Madigan had <u>final</u>
authority.

### Revocability: the disclaimer

Furthermore, the revocability of the initial benefits award
was communicated to Plaintiffs by the clear terms of the
disclaimer included in the April 11 letter.  The language of the
disclaimer, located in the body of an attachment labeled <u>Estimate</u>

-15-

of Survivor Benefits, bears repeating: "In the event of any
inconsistency between the information contained in this statement
and the provisions of the plans, the plans, as well as any
applicable administrative regulations, will govern."

In Perreca v. Gluck, 295 F.3d 215 (2d Cir. 2002), the Court
addressed a dispute as to whether plaintiff was entitled to
pension benefits for the period from 1959 to 1966 when he retired
in 1986.  In 1984, he had received an Annual Statement of
Benefits that included the early period of employment in the
calculations.  A disclaimer on the back of the sheet read, "Every
effort was made to avoid errors in the preparation of this
statement.  However, you will appreciate that errors may have
occurred and that factors and assumptions used for projecting
benefits may be subject to change.  Actual benefits are, of
course, subject to verification before any payments are
authorized."  The Court rejected the plaintiff's promissory
estoppel claim that the Statement constituted an enforceable
promise, and wrote,

> In light of the prominent disclaimer printed
> on the statement that specifically cautioned
> Perreca that "[a]ctual benefits are ...
> subject to verification before any payments
> are authorized," the statement of projected
> benefits cannot, in the circumstances of this
> case, reasonably be construed as a promise
> concerning the precise amount of benefits
> accrued.  The disclaimer was clearly printed
> on the statement prepared for Perreca and
> notified him that actual benefits were
> subject to verification before any payments

-16-

would be authorized.

295 F.3d at 226.

The ExxonMobil disclaimer seems likewise clear, prominent, specific and designed to alert the reader that its contents were "subject to verification."  Although the ExxonMobil disclaimer was presumably intended to cover mistakes in calculations, its wording is broad enough to include the mistake of extending benefits to someone who was not eligible.

### Dr. Renfro's eligibility: the Plan's terms

Dr. Renfro's eligibility for GUL and VADD benefits is not open to question under the terms of the Plan.  Articles 2 and 4 of the Plan clearly require that the eligible ExxonMobil employee must enroll in the GUL and VADD plans via an election form, which includes the employee's agreement to pay the premiums for the coverage.  In ruling in ERISA cases, courts have consistently held that a plan cannot be modified using the doctrine of estoppel.  When misrepresentations are made to employees, those misrepresentations cannot alter the plan, except to the extent that they reflect a reasonable interpretation of the plan language.  Law v. Ernst & Young, 956 F.2d 364, 370 (1st Cir. 1992).

In Alexander v. Anheuser-Busch Cos., 990 F.2d 536 (10th Cir. 1993), plaintiff received a letter from his employer describing a new long-term disability insurance plan.  He signed up for the

-17-

insurance and paid the appropriate premiums.  However, when he took medical leave, he discovered that he was not covered by the policy.  To make matters worse, he was then prevented from going back to work because he could not obtain a medical release.  Nonetheless, the Court held that Alexander could not prevail on his claim for benefits.

> Anheuser-Busch's letter and any assurances
> Alexander may have received regarding his
> coverage do not change this outcome.  We held
> in <u>Miller v. Coastal Corp.</u>, 978 F.2d 622, 624
> - 25 (10th Cir. 1992), that the coverage of
> an ERISA plan may not be enlarged by informal
> oral or written communications under a theory
> of federal common law estoppel.  Because
> ERISA expressly requires the terms of the
> benefit plan to be written in a formal plan
> document, 29 U.S.C. § 1102(a)(1), the
> language of the plan must control over
> Anheuser-Busch's oral and written
> misrepresentations.

990 F.2d at 539.

Similarly, the Estimate of Survivor Benefits sent to Plaintiffs in this case does not operate to alter the Plan.  The Plan is clear in its terms that the GUL and VADD coverages were optional coverages, to be selected and paid for by the employee. Although Dr. Renfro was eligible for the coverage; sadly, he did not have the opportunity to sign up for it before his untimely death.  No subsequent action can change these circumstances or alter the terms of the Plan.

### No contract

In their Post-trial Brief, Plaintiffs assert that ExxonMobil's offer of employment to Dr. Renfro, followed by his acceptance of that offer, formed a contract, with the disputed benefits as part of the consideration.  Plaintiffs then proceed to advance several theories, based on the federal common law of contracts, to support their claim that the GUL and VADD election made by Benefits Administration employees is binding, irrevocable and non-rescindable.  They invoke the prevention doctrine, and state that ExxonMobil is barred from invoking the failure of a condition precedent (filling out the election forms) as a defense.  However, no great legal analysis is necessary to establish that there was no contract to provide GUL or VADD benefits at company expense to be found among the facts before the Court.  There was no promise, no offer, no acceptance, no consideration, no unjust enrichment, no reliance – in short, no contract.  This is a  common sense conclusion which begs no legal support.

The Court is persuaded that the Benefits Administration employees, moved by the emotion of the moment, made a mistake. They tried to obtain benefits for Dr. Renfro's beneficiaries for which he was not eligible, because he had been in a tragic accident before he had a chance to sign up.  Their efforts were memorialized in a letter to the beneficiaries, with an <u>estimate</u>

of the forthcoming benefits attached, complete with a clear and
effective disclaimer.  In less than a month, their mistake came
to the attention of the Plan Administrator, and steps were taken
to inform the beneficiaries of the mistake.  There is no evidence
that the beneficiaries changed their position in light of the
first letter; indeed, no reasonable person would have depended on
the prospect of a payment labeled an 'estimate.'  Accordingly,
there was no reasonable detrimental reliance by Plaintiffs on the
April 11th letter.  This contrasts with the facts in <u>New England
Mutual Life Ins. Co. v. Hastings</u>, 733 F. Supp. 516 (D.R.I. 1990),
where there was detrimental reliance on an erroneous pension pay-
out.  This writer, utilizing Rhode Island law, held that the
payee was not required to make restitution to the insurance
company.

ERISA law is more forgiving of administrative mistakes even
where there is reliance.  The cases tell many sad stories of
plaintiffs who make significant changes in their lives based on
misunderstandings and even misrepresentations made by their
employers, or other advisors, concerning prospective benefits.
For example in <u>Davidian v. Southern California Meat Cutters
Union</u>, 859 F.2d 134 (9th Cir. 1988), plaintiff had to make an
election about health coverage at the time of his retirement.  An
employee of the union's Employees Benefits Fund described the
available options to him and plaintiff chose the plan that would

pay approximately 80% of major medical expenses.  After retiring
and undergoing open heart surgery, plaintiff learned that the
plan he had chosen had a major medical cap of $20,000, which he
had not been informed of at the time of his election.  The Ninth
Circuit Court rejected plaintiff's claim that the Fund was
estopped from denying payment of his claim for the expenses
associated with his heart surgery, because payment would have
been inconsistent with the written terms of the plan, and
therefore improper.  859 F.2d at 136.  *See also* <u>Watson v.
Deaconess Waltham Hosp.</u>, 298 F.3d 102 (1st Cir. 2002)(during
illness plaintiff, on advice of employer, reduced schedule to
part-time without understanding it would terminate his long-term
disability insurance);  <u>Perreca v. Gluck</u>, 295 F.3d 215 (2d Cir.
2002) (plaintiff took early retirement based on inaccurate
statement of benefits); <u>Mauser v. Raytheon Co. Pension Plan</u>, 239
F.3d 51 (1st Cir. 2001) (court found no reliance where, based on
inaccurate summary plan description, plaintiff returned to work
for employer after absence with the understanding that pension
would be based on previous and current service); <u>Alexander v.
Anheuser-Busch Cos.</u>, 990 F.2d 536 (10th Cir. 1993)(plaintiff took
medical leave based on advice of human resources director; then
found he was ineligible for long-term disability insurance and
was barred from returning to work); <u>Law v. Ernst & Young</u>, 956
F.2d 364 (1st Cir. 1992)(plaintiff retired early based on

-21-

inaccurate pension information supplied by former employer).

In the present case, Plaintiffs could not reasonably have relied to their detriment on the estimate of benefits sent to them with the April 11, 2001, letter. There was no evidence presented that either Plaintiff undertook any significant change in position during the short period of time that they believed they would be receiving an additional two million dollars. For all the reasons outlined above, the Court denies Plaintiffs' claim under Count I, for benefits due pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B).

### Counts II and III

In Count II Plaintiffs make a claim for equitable relief, to be made whole in the amount of the denied benefits ($2,041,000), based on breach of fiduciary duty by the Benefits Administration employees in failing to timely provide Dr. Renfro with the benefit election forms. It is alleged that, but for the breach, Dr. Renfro would have had the opportunity, and would have exercised the opportunity, to elect GUL and VADD coverage. This claim is brought pursuant to ERISA Section 502(a)(3), as amended 29 U.S.C. § 1132(a)(3).

In Count III Plaintiffs also make a claim for equitable relief, pursuant to 29 U.S.C. § 1132 (a)(3). They posit that Defendants breached their fiduciary duty by failing to pay Plaintiffs the GUL and VADD benefits from the Plan's

-22-

discretionary fund known as the Premium Stabilization Reserves.
Count III seeks payment of the GUL and VADD benefits from that
discretionary fund.

All three counts of Plaintiffs' operative Complaint seek the
same remedy – the payment of the GUL and VADD benefits to Dr.
Renfro's beneficiaries.  Because each count seeks the same
remedy, and because Counts II and III ostensibly seek a remedy in
the form of equitable relief, these counts require careful
scrutiny in light of the Supreme Court's decisions in <u>Varity</u>
<u>Corp. v. Howe</u>, 516 U.S. 489 (1996), and <u>Great-West Life & Annuity</u>
<u>Ins. Co. v. Knudson</u>, 534 U.S. 204 (2002).

### <u>Varity</u>

In <u>Varity Corp. v. Howe</u>, the Varity Corporation transferred
some of its financially faltering divisions to a subsidiary.
Employees were encouraged by the employer and the benefit plan
administrator to transfer to the new division and were assured
that their benefits would be secure.  In fact, the transferred
employees lost their benefits when the subsidiary went into
receivership the following year.  The Supreme Court held that the
employees could sue the plan administrator for individualized
equitable relief for breach of fiduciary duty, under Section
502(a)(3).  In analyzing the options available to the plaintiffs,
the Court determined that they could not bring a suit pursuant to
29 U.S.C. § 1132(a)(1)(B) because they were no longer

participants in the plan.   They were similarly barred by the

second subsection because it does not provide a remedy for

individual beneficiaries.   "They must rely on the *third*

subsection or they have no remedy at all," the Court concluded.

516 U.S. at 515.   The third subsection, the Court wrote, was a

"'catchall' provision," acting "as a safety net, offering

appropriate equitable relief for injuries caused by violations

that § 502 does not elsewhere adequately remedy."   516 U.S. at

512.

Following the reasoning of Varity, the First Circuit in

LaRocca v. Borden, Inc., 276 F.3d 22 (1st Cir. 2002), held that

when a plan beneficiary has an avenue for recovery via another

subsection, subsection (3) is not available.

> Varity circumscribes the applicability of
> Section a(3); "[W]here Congress elsewhere
> provided adequate relief for a beneficiary's
> injury, there will likely be no need for
> further equitable relief..."   Id. at 515, 116
> S.Ct. 1065.
>     Following this guidance, federal courts
> have uniformly concluded that, if a plaintiff
> can pursue benefits under the plan pursuant
> to Section a(1), there is an adequate remedy
> under the plan which bars a further remedy
> under Section a(3).

276 F.3d at 28.   *See also* Alves v. Harvard Pilgrim Health Care,

Inc., 204 F. Supp. 2d 198, 206 (D. Mass. 2002).

In the present case, Plaintiffs are beneficiaries under the

ExxonMobil Plan and, consequently, have a cause of action

-24-

pursuant to § 502 (a)(1). Count I of their Complaint pleads that cause action for denial of benefits due them under the Plan; specifically, the GUL benefits of $785,000 and the VADD benefits of $1,256,000. In Counts II and III Plaintiffs attempt to pursue another path to the same destination – they seek the same relief, the GUL benefits and VADD benefits denied them by Defendants. Under _Varity_ and _LaRocca_, Plaintiffs are barred from pursuing the same remedy through an alternate subsection.

### Great-West Life & Annuity

The Supreme Court further constricted the field of ERISA remedies in _Great-West Life & Annuity Ins. Co. v. Knudson_, 534 U.S. 204 (2002). Continuing in the direction it initiated in _Mertens v. Hewitt Associates_, 508 U.S. 248 (1993), the Court in _Great-West_ concluded that the "appropriate equitable relief" available for breaches of subsection (a)(3)[1] must be interpreted narrowly.

In _Great-West_, Knudson was seriously injured in a car accident and her husband's health plan paid $411,157.11 of her medical expenses. The health plan had a reimbursement provision which required that the beneficiary reimburse the plan for any

---

[1]  This section reads, "A civil action may be brought -- ...(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;...

medical expenses recouped from a third party.  Knudson did

recover $650,000 from various tortfeasors in connection with her

car accident.  Of that, the amount attributable to past medical

expenses was sent to Great-West to satisfy the reimbursement

provision.  (Great-West had insured the health plan through a

stop-loss policy.)  The remainder of the tort recovery was used

to establish a special needs trust for Knudson's ongoing medical

costs.  Great-West sued Knudson to recover the balance of its

'pay-out.'

     The United States District Court for the Central District of

California granted summary judgment for Knudson, holding that

Great-West's right of recovery was limited to the portion of the

tort settlement that had been allocated for past medical

expenses.  The Ninth Circuit affirmed on the grounds that

"judicially decreed reimbursement for payments made to a

beneficiary of an insurance plan by a third party is not

equitable relief and is therefore not authorized by § 502(a)(3)."

534 U.S. at 209.

     The Supreme Court granted certiorari and affirmed the Ninth

Circuit.  Recapping its reasoning in Mertens, the Court stressed

the importance of Congress' use of the phrase "equitable relief,"

and said, "...we held that the term 'equitable relief' in §

502(a)(3) must refer to 'those categories of relief that were

typically available in equity...'" 534 U.S. at 210.  In response

-26-

to Great-West's argument that it sought an equitable remedy in the form of restitution, the Supreme Court distinguished restitution at law from equitable restitution. Restitution in equity, the Court wrote, is "ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." 534 U.S. at 213. In concluding that Great-West sought legal restitution, the Court wrote,

> The basis for petitioners' claim is not that respondents hold particular funds that, in good conscience, belong to petitioners, but that petitioners are contractually entitled to *some* funds for benefits that they conferred. The kind of restitution that petitioners seek, therefore, is not equitable – the imposition of a constructive trust or equitable lien on particular property – but legal – the imposition of personal liability for the benefits that they conferred upon respondents.

534 U.S. at 214.

The Supreme Court's decision, which itself divided the Court five to four, has spawned diverse results. Subsequent distinctions have relied on factual differences, specifically that Great-West involved an insurer seeking reimbursement, and not a breach by a fiduciary. *See* Aetna Health Inc. v. Davila, 542 U.S. 200, ___, 124 S. Ct. 2488, 2503 (2004).

In the First Circuit, Great-West was followed in Barrs v.

-27-

Lockheed Martin Corporation, 287 F.3d 202 (1st Cir. 2002), where plaintiff sued Lockheed for breach of fiduciary duty for failing to inform her that her ex-husband had discontinued the life insurance policy which had named her as a beneficiary. Lockheed argued that her claim for damages under 29 U.S.C. § 1132(a)(3) was improper under Great-West. The District Court stated that the claim could be viewed as a request for equitable reinstatement of beneficiary status, and Barrs argued that she was entitled to equitable restitution. 287 F.3d at 206. The First Circuit, however, sidestepped the procedural issue by concluding that there was no breach of fiduciary duty. 287 F.3d at 206.

The First Circuit again confronted the fuzzy problem of equitable restitution in Watson v. Deaconess Waltham Hosp., 298 F.3d 102 (1st Cir. 2002), which case included a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). In a footnote, the Court explained that defendant Deaconess argued that the plaintiff was seeking money damages, which were unobtainable through this subsection. Again, the Court sidestepped the issue:

> It is not yet clear how the line of precedent
> from our sister circuits indicating that
> restitution and reinstatement are equitable
> remedies under § 1132 (a)(3) will be affected
> by Great-West. Because we decide this case
> for the defendants on other grounds, we need
> not decide whether Great-West would preclude
> the type of relief Watson seeks.

-28-

298 F.3d at 110, n. 8, (cites omitted).  See also <u>Massey v. Stanley-Bostitch, Inc.</u>, 255 F. Supp. 2d 7 (D.R.I. 2003).

It appears to this Court that Plaintiffs seek the same remedy in each count - the proceeds of the GUL and VADD plans that they have been denied - and that this remedy is legal and constitutes money damages.  However, given the current murky status of the meaning of equitable restitution, the Court chooses to follow the lead of the First Circuit by sidestepping this determination and deciding the breach of fiduciary duty claims on their merits.

### Count II - timely provision of election forms

The ExxonMobil employees have testified that they followed routine practice in getting the benefit election forms to Dr. Renfro.  This process included providing certain employment forms to Dr. Renfro on his first day of work, then forwarding the completed forms to the Benefits Administration office in Houston. The forms were reviewed by the Houston office and the data entered in the computer.  Another group of documents, the benefits packet, was then generated and reviewed prior to being sent to Dr. Renfro.  This took a week.  The benefits packet, including the GUL and VADD election forms, was in the outgoing mailbox in the Houston Benefits Administration office on Monday morning, the day that Dr. Renfro died.  In the normal course of events, the packet would have been mailed that day and arrived in

Beaumont, barring any postal glitch, no later than the Wednesday of the second week of Dr. Renfro's employment.

Plaintiffs maintain that this time lag deprived Dr. Renfro of the opportunity to elect the optional insurance coverage by failing to provide him with the elections in a timely manner. Plaintiffs argue that because Dr. Renfro was eligible for the coverage on his first day of work, it was a breach of fiduciary duty to fail to get those forms to him prior to, or at least on, that first day.

ERISA fiduciaries are required by statute to discharge their duties "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B). The statute also specifies a duty on the part of the administrator to furnish certain documents and information to the plan beneficiaries and participants. 29 U.S.C. §§ 1024 - 1025.

While a duty to provide participants with necessary forms in a timely manner is certainly implied in the ERISA statute and the ExxonMobil Life Insurance Plan documents, neither the statute or the Plan addresses the particular issue of how quickly optional insurance election forms must be provided to a new employee. The First Circuit wrote in <u>Barrs v. Lockheed Martin Corp.</u>, "ERISA's

-30-

specific statutory duties are not meant to be exhaustive of a
fiduciary's obligations; federal courts are expected to flesh out
ERISA's general fiduciary duty clause, 29 U.S.C. § 1104(a)." 287
F.3d 202, 207 (1st Cir. 2002).

     In <u>Alves v. Harvard Pilgrim Health Care, Inc.</u>, 204 F. Supp.
2d 198 (D. Mass. 2002), the Court analyzed a prescription drug
plan to determine whether the insurer breached its fiduciary duty
when it failed to disclose to the participants that the actual
cost of some prescription drugs might be less than the flat
copayment.  Explaining that the fiduciary duty to disclose
information was characterized by an "amorphous quality," id. at
213, the Court wrote,

> Courts must apply common law trust
> standards in determining the scope of an
> ERISA's fiduciary obligations, bearing in
> mind the special nature and purpose of ERISA
> benefit plans... Here there is no evidence of
> the usual hallmarks of breach of fiduciary
> duty: intentional misrepresentation, bad
> faith failure to protect the financial
> integrity of the plan, or a failure to
> provide material information in response to a
> direct inquiry.

204 F. Supp. at 214.  Similarly, in <u>Watson v. Deaconess Waltham
Hosp.</u>, the First Circuit held that there had been no breach of
fiduciary duty by defendant hospital because it found no evidence
of "bad faith, concealment, or fraud." 298 F.3d 102, 114 (1st
Cir. 2002).

     Plaintiffs have not alleged that the Benefits Administration

-31-

employees' failure to timely provide Dr. Renfro with the election forms was an act of bad faith, fraud, concealment or intentional misrepresentation. Rather, they allege, it was indicative of "bureaucratic lethargy and lack of effective procedures..." that operated to Dr. Renfro's prejudice. [Plaintiffs' Post-Trial Brief at p. 46].

As noted above, there is no rule in the statute or the Plan to guide the Court in assessing Defendants' lethargy; however, ERISA does provide some helpful indicators. For example, summary plan descriptions and annual reports must be provided to participants "within 90 days..." 29 U.S.C. § 1024(b)(1)(A). Penalties may be imposed on a plan administrator who fails to comply with ERISA's reporting requirements within 30 days of receiving a written request from a participant or beneficiary. 29 U.S.C. § 1132(1). Measured on this scale, the time period of approximately eight business days that it would have taken to get the election forms to Dr. Renfro does not seem egregiously lethargic or inefficient, bearing in mind the different locations involved - Beaumont, Houston and Dallas. A tragedy such as the one that claimed Dr. Renfro's life certainly instructs us all on the preciousness of every moment of life; however, had Dr. Renfro lived, the eight day period that it took his election forms to reach him would have been insignificant. Certainly, this Court cannot characterize the Benefit Administration office's routine

-32-

practice of preparing and mailing the election forms to new employees after their first day of work as a breach of fiduciary duty.

In any event, there is a fundamental flaw in this Count II claim which defeats recovery.  There is not one shred of evidence that Dr. Renfro would have elected any of these optional plans at his expense if he had received the benefits packet on the first day of his employment.  This is not a situation where decedent had a wife and young family whom he would have wanted to protect financially.  He was unmarried at the time and his adult children were pursuing their own careers - his daughter, Rachelle Green, was practicing law in Rhode Island and his son, Byron Renfro, was a businessman (utilizing his M.B.A.) in California.  Under the circumstances, no inference can be drawn that Dr. Renfro would have wanted additional coverage and the concomitant deductions from his paycheck.

In short, Plaintiffs have not established a basis for recovery under Count II.

### Count III - failure to pay Plaintiffs from discretionary funds

According to Plaintiffs' Complaint, the ExxonMobil Life Insurance Plan had discretionary funds, including Premium Stabilization Reserves, and it should have used these funds to pay Plaintiffs an amount equivalent to the GUL and VADD benefits. Plaintiffs assert that Defendants' failure to authorize such a

payment was a breach of their fiduciary duty to Dr. Renfro and
his beneficiaries.  Plaintiffs included this count in their
complaint, but little evidence was provided on this topic at
trial.  As Defendants have pointed out, Plaintiffs did not
include any arguments on this count in their post-trial
submissions.  It does appear that Plaintiffs are not pressing
this count; however, as it has not been explicitly withdrawn, the
Court will address it briefly.

The Court has concluded previously in this decision, in its
analysis of Plaintiffs' claim pursuant to statutory section 29
U.S.C. § 1132(a)(1)(B), that Plaintiffs are not entitled to
benefits from the ExxonMobil GUL and VADD plans because Dr.
Renfro did not make the necessary elections for this coverage.
Because Plaintiffs are not entitled to this coverage, it is no
breach of fiduciary duty for Defendants to fail to pay the
benefits.  In fact, if the Plan Administrator were to authorize
payment from the Plan's reserve funds, this act would likely
conflict with her fiduciary duty to the Plan's other participants
and beneficiaries, because this fund is created by the premiums
paid by the other participants who have elected the optional
plans.

Consequently, the Court holds that there was no breach of
fiduciary duty by the Plan Administrator or any other employees
of ExxonMobil in this case.  The Plan Administrator acted within

-34-

her authority and discretion in refusing to make the GUL and VADD

benefits available to Plaintiffs since Dr. Renfro had failed to

record the necessary election and the promise to pay premiums.

## Conclusion

For the reasons stated above, the Court decides this case in

favor of Defendants.   The clerk shall enter judgment for all

Defendants on all counts of the Second Amended Complaint.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
February  9 , 2006